IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

**PHARMACEUTICAL RESEARCH
AND MANUFACTURERS OF
AMERICA,**
670 Maine Avenue, SW,
Suite 1000
Washington, D.C. 20024

    *Plaintiff,*

        v.

**ANTHONY BROWN**, *in his official
capacity as Attorney General of Maryland*,
Office of the Maryland Attorney General
200 St. Paul Place
Baltimore, Baltimore County, MD 21202,

**NEIL LEIKACH,** *in his official capacity as
a member of the Maryland Board of
Pharmacy*, Maryland Board of Pharmacy
4201 Patterson Ave. #5
Baltimore, Baltimore County, MD 21215

**PEGGY GLASCOE GEIGHER,** *in her
official capacity as a member of the
Maryland Board of Pharmacy*,
Maryland Board of Pharmacy
4201 Patterson Ave. #5
Baltimore, Baltimore County, MD 21215

**KRISTOPHER RUSINKO,** *in his official
capacity as a member of the Maryland
Board of Pharmacy*,
Maryland Board of Pharmacy
4201 Patterson Ave. #5
Baltimore, Baltimore County, MD 21215

**JENNIFER HARDESTY,** *in her official
capacity as a member of the Maryland
Board of Pharmacy*,

Civil Action No. 1:24-cv-01631

Maryland Board of Pharmacy
4201 Patterson Ave. #5
Baltimore, Baltimore County, MD 21215

**KEVIN MORGAN,** *in his official capacity*
*as a member of the Maryland Board of*
*Pharmacy*,
Maryland Board of Pharmacy
4201 Patterson Ave. #5
Baltimore, Baltimore County, MD 21215

**AKESH PATEL,** *in his official capacity as*
*a member of the Maryland Board of*
*Pharmacy*,
Maryland Board of Pharmacy
4201 Patterson Ave. #5
Baltimore, Baltimore County, MD 21215

**JAVIER VAZQUEZ,** *in his official*
*capacity as a member of the Maryland*
*Board of Pharmacy*,
Maryland Board of Pharmacy
4201 Patterson Ave. #5
Baltimore, Baltimore County, MD 21215

**KARLA EVANS,** *in her official capacity as*
*a member of the Maryland Board of*
*Pharmacy*,
Maryland Board of Pharmacy
4201 Patterson Ave. #5
Baltimore, Baltimore County, MD 21215

**BRENDA OLIVER,** *in her official*
*capacity as a member of the Maryland*
*Board of Pharmacy*,
Maryland Board of Pharmacy
4201 Patterson Ave. #5
Baltimore, Baltimore County, MD 21215

**KAREN SLAGLE,** *in her official capacity*
*as a member of the Maryland Board of*
*Pharmacy*,
Maryland Board of Pharmacy
4201 Patterson Ave. #5
Baltimore, Baltimore County, MD 21215

**KRISTEN FINK,** *in her official capacity as a member of the Maryland Board of Pharmacy*,
Maryland Board of Pharmacy
4201 Patterson Ave. #5
Baltimore, Baltimore County, MD 21215

**ADETORO ORIAIFO,** *in his official capacity as a member of the Maryland Board of Pharmacy*,
Maryland Board of Pharmacy
4201 Patterson Ave. #5
Baltimore, Baltimore County, MD 21215

**AND**

**DAPHANIE ROBINSON,** *in her official capacity as a member of the Maryland Board of Pharmacy*,
Maryland Board of Pharmacy
4201 Patterson Ave. #5
Baltimore, Baltimore County, MD 21215**,**

    *Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.       Maryland House Bill 1056, recently enacted into law, is preempted by federal law, and violates the Commerce Clause and the United States Constitution's bar on extraterritorial regulation.  Plaintiff Pharmaceutical Research and Manufacturers of America ("PhRMA") brings this Complaint and states as follows:

## PRELIMINARY STATEMENT

2.       The federal 340B Drug Pricing Program, 42 U.S.C. § 256b ("340B"), requires that drug manufacturers whose products are eligible for reimbursement under Medicare Part B and the Federal Financial Participation under the Medicaid program must offer steep price reductions on covered outpatient drugs to 15 specified types of eligible healthcare providers ("covered entities").  42 U.S.C. § 256b(a)(1).  Congress authorized the Secretary of Health and Human Services ("HHS") to enforce and resolve disputes under 340B through a range of carefully balanced federal administrative mechanisms designed to incentivize drug manufacturer participation in each of these programs.  *Id.* § 256b(d).  The obligations of drug manufacturers to offer 340B pricing are provided by statute and by federal contract—a Pharmaceutical Pricing Agreement ("PPA") between each manufacturer and HHS.

3.       At the heart of this litigation is an effort by PhRMA and its member drug manufacturers to protect the integrity of 340B.  Congress created 340B to help underserved patient populations who receive treatment at covered entities.  But over recent years, the federal program has morphed into a money-making enterprise for national pharmacy chains and others who seek to enrich themselves at the expense of these underserved patients.  For-profit pharmacy interests, acting in concert with covered entities and others, improperly leverage 340B pricing for their own financial advantage, often without providing any benefits to the vulnerable patient populations 340B was intended to help.  Most recently, state legislatures in Maryland and elsewhere have intervened on the side of those who have improperly benefited from 340B.  These intrusions are

not aimed at ensuring patient access to drugs—instead they directly and intentionally seek to provide 340B-pricing to entities not entitled to it under federal law.

4.       The United States Supreme Court has previously invalidated efforts to distort and undermine the quintessentially *federal* nature of 340B.  In *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011), the Court rejected an effort by a group of county medical facilities (covered entities) to enforce 340B drug pricing requirements outside the federal administrative mechanisms provided in the 340B statute.  The Supreme Court explained that 340B must be "harmoniously" administered on a "nationwide basis," with HHS "hold[ing] the control rein."  *Astra*, 563 U.S. at 120 (stressing the "interdependent nature of [340B and Medicaid]" and explaining that "an adjudication of rights under one program must proceed with an eye towards any implications for the other").

5.       This case concerns Maryland House Bill 1056 ("HB 1056"), which requires drug manufacturers to provide 340B-priced drugs—including those protected by a patent—to an unlimited number of pharmacies, including for-profit pharmacies (so-called "contract pharmacies") that have independent agreements with covered entities.  HB 1056 provides for extensive state law penalties, including criminal prosecution and civil penalties of up to $5,000 per violation, if drug manufacturers participating in the federal program do not also comply with HB 1056's new and additional state law requirements.  Md. Code, Health Occ. § 12-6C-09.1(D); Md. Code, Com. Law § 13-411.  Thus, in direct contravention of the Supreme Court's reasoning in *Astra* and the 340B statute, HB 1056 creates an alternative state law mechanism to compel manufacturers to give federal 340B price reductions in a manner directly at odds with federal law.

6.       HB 1056, unambiguous about its goals, specifically identifies its target—federal "340B drug[s]," *i.e.*, "covered outpatient drug[s] under 42 U.S.C. § 256b."  Md. Code, Health Occ.

§ 12-6C-09.1(A)(4).  In its four pages, HB 1056 refers to the federal 340B statute more than a dozen times.

7.      HB 1056 is a transparent attempt to regulate drug pricing by imposing federal 340B price reductions where they would not apply under federal law.  Understanding that it cannot legally mandate 340B pricing in this way, Maryland and others have tried to rationalize HB 1056 as simply a drug "delivery" regulation.  But there is *no dispute* that Maryland pharmacies can already order and receive delivery of the drugs at issue at market prices.  The only question is whether and when the reduced federal 340B price applies.

8.      HB 1056 significantly interferes as well with the objectives and goals of the federal patent laws, 35 U.S.C. §§ 1 *et seq.* (the "Patent Act") which secures to inventors the exclusive right to sell, produce, and license patented products.  The Patent Act, derived from Article I, Section 8, Clause 8 of the United States Constitution, spurs innovation by allowing patentees to exercise monopoly power and to maximize profits.  *Id.*  By requiring the manufacturers of patented drugs to sell their products to additional parties, HB 1056 directly interferes with the economic choices that manufacturers alone are entitled to make.  HB 1056 does not effectuate a core police power but instead interferes with the terms of a federal program and in a manner that undermines the core objectives and purposes of the Patent Act.

9.      Under the Supremacy Clause of the United States Constitution, Maryland has no authority to define who has access to 340B-priced drugs.  42 U.S.C. § 256b(a)(1).  That is an exclusively federal responsibility.  Nor can Maryland legally punish drug manufacturers who do not provide 340B pricing to the entities Maryland prefers.

10.      Specifically, HB 1056 seeks to expand 340B drug pricing through a mechanism in Subsection (C) of the state law, relating to what are commonly known as "contract pharmacies."

Over the past decade, concerns about abuse and illegal "duplicate discounts" in the 340B program have skyrocketed as covered entities have teamed up with so-called "contract pharmacies"— mostly for-profit pharmacies—nationwide to find ways to maximize the volume of 340B drug price reductions.  Under the now prevailing "replenishment model," contract pharmacies first order drugs at market prices, and then, following sale of those drugs, seek to replenish their inventories with 340B-priced drugs by retroactively identifying, via black-box algorithms, drugs that are purportedly eligible for 340B pricing.  As a result, the volume of drugs purchased at reduced 340B pricing has exploded, more than tripling over the past decade, without any corresponding growth in the patient population.  *See infra* at ¶¶ 32, 52.  In 2022, 340B purchases reached *$53.7 billion*, a $9.8 billion increase from 2021 and a nearly $50 billion increase from 2009.[1]  And because contract pharmacies claim the 340B pricing retroactively, many of these 340B price reductions are not passed on to indigent or underserved patients actually receiving the drugs.

11.     The United States Government Accountability Office and the HHS Office of the Inspector General have warned about the risk of abuse by covered entities and use of the replenishment model, and a number of drug manufacturers, including many PhRMA members, have identified specific concerns and independently adopted policies to attempt to minimize that risk of abuse.  Although the exact contours of the policies differ, they are all intended to curb abuse, and generally provide a limit on the number of outside pharmacies with which a covered entity may contract to receive 340B-priced drugs and require the contract pharmacy to submit data supporting their claims for the 340B discounts.

---

[1] Adam J. Fein, *The 340B Program Reached $54 Billion in 2022 – Up 22% vs. 2021*, Drug Channels (Sept. 24, 2023), https://tinyurl.com/2nrux6et; Karen Mulligan, Ph.D., *The 340B Drug Pricing Program: Background, Ongoing Challenges and Recent Developments*, Univ. of S. Cal. (Oct. 14, 2021), https://bit.ly/3FFSemV.

12.    Following the Supreme Court's decision in *Astra*, covered entities appeared to understand that any disputes regarding the entities eligible for 340B-priced drugs, including those centered on contract pharmacy use, presented issues of federal law.  Indeed, multiple covered entities filed petitions under § 256b(d)(3) with the federal agency seeking to resolve those contract pharmacy issues.  One group of covered entities alleged that a drug manufacturer "ha[d] violated the 340B statute and regulations by failing to offer covered outpatient drugs at the 340B ceiling price through Petitioner's contract pharmacy arrangements."  *See infra* at ¶ 71.  Those entities asked HHS "to order [the manufacturer] to resume offering covered outpatient drugs at the 340B ceiling price to Petitioner through its contract pharmacies; and to order [the manufacturer] to pay Petitioner an amount equal to the 340B discounts that [the manufacturer] has failed to provide."  *Id.*  Other covered entities maintained in a 2023 filing that HHS had jurisdiction over its contract pharmacy dispute under the 340B statute because it "has authority to enforce the 340B statute."

13.    Eventually, multiple federal courts addressed drug manufacturers' 340B obligations as to 340B-priced drugs shipped to contract pharmacies.  To date, four federal courts have rejected the argument that drug manufacturers have an obligation to deliver 340B-priced drugs to an *unlimited number* of contract pharmacies located anywhere in the United States, regardless of the circumstances.  *See infra* at ¶¶ 15, 38–39, 67–70.  Instead, courts have recognized that the relevant question is whether manufacturers have complied with the federal statutory requirement that they "shall offer" 340B-priced drugs to *covered entities*.  *Id.*; *Novartis Pharms. Corp. v. Johnson*, Nos. 21-5299, 21-5304, 2024 WL 2279829 (D.C. Cir. May 21, 2024); *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Human Servs.*, 58 F.4th 696, 703-06 (3d Cir. 2023) ("*Sanofi*"); *Novartis Pharms. Corp. v. Espinosa*, No. 21-cv-1479, 2021 WL 5161783, at *5-7 (D.D.C. Nov. 5, 2021), *aff'd sub nom. Novartis*, 2024 WL 2279829.  More specifically:  Must a

good faith "offer" by a drug manufacturer under 42 U.S.C. § 256b(a)(1) also include an undertaking to deliver 340B-priced drugs to *every pharmacy anywhere*, including to pharmacies hundreds or thousands of miles from the covered entities where patients are treated?  The answer is no.  *Sanofi*, 58 F.4th at 703-06; *Novartis*, 2024 WL 2279829, at *8; *Novartis*, 2021 WL 5161783, at *5-7.

14.    In response to those adverse federal court decisions, covered entities' representatives have turned to the states, arguing that states can mandate that drug manufacturers provide 340B-priced drugs to any contract pharmacy anywhere, even where federal law does not require it.  Maryland is one of nine states so far to pass such a law.

15.    Laws like HB 1056, however, rely on a misreading of the *Sanofi* case, which did not rule that the federal 340B statute left a gap that states are empowered to fill.  As that court explained, the question posed was not whether an obligation exists under federal law to deliver 340B-priced drugs to one, or a limited number, of contract pharmacies.  *Sanofi*, 58 F.4th at 703-04.  The question instead was whether the federal law *unambiguously* mandated delivery to an *unlimited number* of pharmacies, no matter where those pharmacies were.  *Id.* at 703.  The *Sanofi* court concluded that manufacturers' obligations under federal law were nowhere near as broad as the covered entities wished they were.  *Id.* at 704.  That decides the matter here as well.

16.    The D.C. Circuit's recent opinion in *Novartis* confirms this principle.  Construing 340B's requirement to "offer" 340B-priced drugs to covered entities, the court explained that Congress's choice "preserve[d]—rather than abrogate[d]—the ability of sellers to impose at least some delivery conditions."  *Novartis*, 2024 WL 2279829, at *5.  As in *Sanofi*, the court made clear that Congress imposed some constraints on how manufacturers may operate vis-à-vis "offers" of 340B-priced drugs.  *Id.* at *7-8.  Each manufacturer offer must be "bona fide," which the court

6

stated meant that certain "onerous conditions might violate the statute." *Id.* at \*8. But that determination is for the federal government, reviewed by federal courts, to make. *Id.* ("Likewise, we do not foreclose the possibility that these conditions may violate section 340B as applied in particular circumstances—if, for example, [the Health Resources and Services Administration ("HRSA")] could show that a specific covered entity for some reason could not supply the claims information demanded by United Therapeutics."). In other words, the manufacturer's obligations to provide the federal 340B price only extends to shipments directly to covered entities *or* to one contract pharmacy for each covered entity.

17. To administer and enforce HB 1056, Maryland would necessarily intrude into and interfere with the federal program by making multiple decisions uniquely committed to the federal agency and the federal courts under federal law. *For example*, Maryland would need to resolve, in any given case based on the individualized facts before it, questions including whether a covered entity holds title to 340B-priced drugs at all times, whether the individuals who received such drugs were covered entity "patients" (to comply with the federal diversion prohibition) and whether a covered entity and a contract pharmacy have the necessary "principal-agent" relationship required to even arguably comply with federal law, 42 U.S.C. § 256b(a)(5)(A)-(B). Additionally, a covered entity that violates the provisions of the 340B statute is, under the explicit provisions of 42 U.S.C. § 256b(a)(4)-(5), ineligible to receive any 340B-priced drugs. So Maryland must make that determination, too. These are all questions of federal law, committed exclusively to the federal agency and federal courts only. Maryland cannot enforce HB 1056 without rendering decisions on these core federal issues. If Maryland and other states can do this, the uniform federal program will cease to be federal or uniform. Instead, states applying their own laws would make all key decisions. This directly contradicts *Astra*.

18.    HB 1056's penalties also conflict with the carefully balanced provisions in the federal statute.  HB 1056 imposes additional penalties, assessed under different criteria, not provided for in federal law, on top of pre-existing carefully calibrated federal penalties.  The threat of draconian penalties imposed by states, including Maryland's criminal penalty, will transform 340B into something Congress never intended.  Drug manufacturers may decide to opt out of key federal programs as a result, defeating 340B's carefully balanced purposes.  *See Astra*, 563 U.S. at 120 (noting the balancing required and the danger of "HHS [being] unable to hold the control rein"); *see also Novartis*, 2024 WL 2279829, at *6 (noting federal government's argument that 340B's "enforcement scheme is carefully calibrated, which tends to suggest that it is exclusive").

19.    Finally, HB 1056 violates the Constitution's prohibition on state extraterritorial regulation.  It directly regulates wholly out-of-state transactions.  Indeed, HB 1056 contains no provisions limiting its application to Maryland covered entities, Maryland contract pharmacies, drug manufacturers doing business in Maryland, or even drug sales occurring in Maryland.

20.    PhRMA brings this action to declare unlawful this improper state intrusion into the federal 340B scheme and to enjoin preliminarily and permanently the defendants from enforcing HB 1056 against PhRMA's members and as to the sale of their drugs.

## **PARTIES**

21.    PhRMA, a trade association representing the nation's leading innovative biopharmaceutical research companies, advocates for policies that encourage the discovery and development of important new pharmaceutical products.  PhRMA's members, which manufacture and sell pharmaceutical products, participate in the federal 340B program and will thus be forced to supply their drugs at a steeply reduced price to Maryland (and potentially other states) pharmacies under HB 1056 or otherwise face significant criminal or civil penalties.  Neither the claims asserted nor the relief sought requires the participation of any individual member.

22.     Defendant Anthony Brown is the Attorney General of Maryland, the chief law enforcement officer of the state.  The Attorney General is given enforcement authority over the challenged legislation.  Md. Code, Health Occ. § 12-6C-09.1(D)(1)(I)(1) (making a violation of HB 1056 a violation of Maryland's Consumer Protection Act); Md. Code, Com. Law § 13-201 (giving the Attorney General enforcement authority over violations of Maryland's Consumer Protection Act).  The Division of Consumer Protection is in the Office of the Attorney General, Md. Code, Com. Law § 13-201, and it is given investigative and disciplinary power to implement and enforce the challenged legislation.  Md. Code, Health Occ. § 12-6C-09.1(D)(1).

23.     Defendants Neil Leikach, Peggy Glascoe Geigher, Kristopher Rusinko, Jennifer Hardesty, Kevin Morgan, Akesh Patel, Javier Vazquez, Karla Evans, Brenda Oliver, Karen Slagle, Kristen Fink, Adetoro Oriaifo, and Daphanie Robinson are members of the Maryland Board of Pharmacy, which is given authority to enforce the challenged legislation.  *Id.* § 12-6C-09.1(D)(3).

## JURISDICTION AND VENUE

24.     PhRMA's causes of action arise under 28 U.S.C. § 1331, 42 U.S.C. § 1983, and the United States Constitution.  The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

25.     The Declaratory Judgment Act provides that, in a case of actual controversy within its jurisdiction, a United States court may declare the rights and other legal relations of any interested party seeking such declaration.  28 U.S.C. § 2201(a).

26.     This Court has inherent equitable powers to enjoin the actions of state officials if they contradict the federal Constitution or federal law.  *Ex parte Young*, 209 U.S. 123, 159-60 (1908); *accord, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

27.     Venue is proper in this district because this action challenges a Maryland law applicable to the sale of PhRMA's members' drugs in this district, and thus HB 1056 purports to directly restrict and restrain PhRMA members' conduct in selling and distributing drugs within

this district.  28 U.S.C. § 1391(b)(2).  Substantial amounts of PhRMA's members' drugs are sold

under the 340B program to covered entities in this district.  For example, HHS's website reflects

that there are over 426 covered entities in the District of Maryland.  *See* HRSA, Covered Entity

Search Criteria, available at https://340bopais.hrsa.gov/coveredentitysearch.   The same HHS

website reflects that those covered entities maintain a substantial number of contract pharmacy

arrangements, including with contract pharmacies in this district.  Accordingly, HB 1056 is likely

to be enforced against PhRMA members in this district.  Venue is also proper in this district

because Defendant Attorney General maintains an office in this district.  28 U.S.C. § 1391(b)(1).

## BACKGROUND

### A.    The Operation and Growth of 340B

28.    Congress established 340B in 1992 to restore drug discounts that were provided

voluntarily by manufacturers to a select group of safety-net providers before Congress passed the

Medicaid Drug Rebate Program ("MDRP") in 1990.  *See* Nicholas C. Fisher, *The 340B Program:*

*A Federal Program in Desperate Need of Revision After Two-And-A-Half Decades of Uncertainty*,

22 J. Health Care L. & Pol'y 25, 29-30 (2019).  When Congress passed the MDRP in 1990, that

law took the manufacturers' previous *voluntary* "large discounts" to safety net providers like

covered entities and factored them into the calculation of *required* "best price" for purposes of

determining Medicaid rebates.  *See id.* at 29-30.  The "unintended consequence" of this pricing

"snafu" was that drug manufacturers were "disincentivized" from continuing to provide the

voluntary discounts they had provided to safety net providers prior to the MDRP's passage.  *See*

*id.*; *see also* H.R. Rep. No. 102-384, pt. 2, at 9-10 (1992) ("House Report").

29.    Congress created 340B to address the limited problem created by the MDRP's

enactment, specifically to restore the discounts that were previously offered voluntarily by

manufacturers.  *See* Pub. L. No. 102-585, 106 Stat. 4943, 4962; *see also* House Report at 12.  When

Congress passed 340B, the legislative history indicates that it intended to restore "discounts to these clinics, programs, and hospitals," i.e., "direct clinical care" entities, which had previously received voluntary discounts.  House Report at 12.

30.    When it passed the 340B law in 1992, Congress estimated that the Program would only include approximately 90 hospitals, 85 family-planning clinics, 120 AIDS-intervention sites, 54 AIDS drug purchasing assistance programs, a network of hemophilia treatment centers with 150 facilities, and 2,225 health centers that qualified to participate.  *Id.* at 13.

31.    340B "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health care facilities," known as "covered entities," that provide healthcare to certain underserved populations.  *Pharm. Rsch. & Mfrs. Of Am. v. U.S. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 31 (D.D.C. 2014) (quoting *Astra*, 563 U.S. at 113).

32.    In 2022, 340B-priced purchases reached *$53.7 billion*, *a $9.8 billion increase from 2021 and a nearly $50 billion increase from 2009*.  Adam J. Fein, *The 340B Program Reached $54 Billion in 2022 – Up 22% vs. 2021*, Drug Channels (Sept. 24, 2023), https://tinyurl.com/2nrux6et ("Fein 2023").  There has been no similar increase in the relevant underserved patient populations that could explain this explosive growth.

33.    That same year, the list price value (*i.e.*, based on wholesale acquisition cost) of 340B purchases was $106 billion.  *Id.*; *see also* Rory, Martin, PhD, *The 340B Drug Discount Program Exceeds $100B in 2022*, IQVIA (Apr. 14, 2023), https://www.iqvia.com/locations/united-states/library/white-papers/the-340b-drug-discount-program-exceeds-uds100b-in-2022.  That is equal to "more than 16% of pharmaceutical manufacturers' total gross sales of brand-name drugs at list prices."  Fein 2023.  If this recent growth trend continues unabated, 340B is estimated to become the "largest federal drug program

by 2026[,] exceeding gross drug purchases through Medicare Part D, Medicare Part B and Medicaid." Berkeley Rsch. Grp., 340B Program at a Glance (2021), https://tinyurl.com/ms2afa2y.

34.     340B is governed by a federal statutory framework, implemented by the HRSA, a federal agency within HHS.  Under 340B, participating manufacturers "*shall offer*" to each "covered entity" (as delineated by the federal 340B statute) certain outpatient drugs (also specified by statute) at or below a price (again set by statute), *if* such drugs are offered to any other purchasers, meaning manufacturers must make a genuine offer to covered entities for purchase of 340B-priced drugs.  42 U.S.C. § 256b(a)(1).  That requirement does not involve an obligation to provide 340B-priced drugs to an unlimited number of contract pharmacies.  *See supra* ¶ 15; *see infra* at ¶¶ 38-39, 67-70.

35.     Federal law defines "covered entity" for purposes of 340B to mean an entity that "is one of" 15 types of specifically enumerated categories of healthcare providers, 42 U.S.C. § 256b(a)(4), and that meets other specifically enumerated requirements, including that the entity does not engage in an unlawful transfer of 340B-priced drugs and does not seek or cause a duplicate Medicaid discount (*see infra* at ¶ 49).  42 U.S.C. § 256b(a)(5).

36.     Federally Qualified Health Centers, children's hospitals, critical access hospitals, sole community hospitals (*i.e.*, hospitals geographically isolated from other hospitals, 42 U.S.C. § 1395ww(d)(5)(D)(iii)), and certain other clinics and hospitals are all specifically defined as "covered entities" eligible to enroll and participate in 340B.  42 U.S.C. § 256b(a)(4); *see also Am. Hosp. Ass'n v. Azar*, 967 F.3d 818, 820-22 (D.C. Cir. 2020).  *No* pharmacies and *no* for-profit entities are included as "covered entities."  42 U.S.C. § 256b(a)(4).

37.     Federal law defines the "ceiling price" for purposes of 340B to mean "the maximum price that covered entities may permissibly be required to pay for the drug."  *Id.* § 256b(a)(1).  The

ceiling price is the highest price a manufacturer may charge to 340B covered entities for a covered outpatient drug on 340B-eligible purchases.  That ceiling price is deeply reduced compared to the drug's market price.  Manufacturers must "offer" their covered outpatient drugs at or below the applicable "ceiling price" to "covered entities," and only "covered entities" may receive this pricing under the express terms of federal law.  *See id.*

38.    Identifying the specific obligations imposed by 340B's "shall offer" provision on drug manufacturers requires the interpretation of 42 U.S.C. § 256b(a)(1) under federal law.  According to courts that have reviewed this question to date, a drug manufacturer's appropriate good faith offer means that the manufacturer must provide some meaningful path for covered entities to obtain these medications at the 340B price.  *See* 42 U.S.C. § 256b(a)(1); *Novartis*, 2024 WL 2279829, at \*5; *Sanofi*, 58 F.4th at 703.  But the statute does not mandate a commitment to provide 340B-priced drugs to an unlimited number of contract pharmacies of a covered entity's choosing.  *Novartis*, 2024 WL 2279829, at \*6 ("The requirement to 'offer' drugs at a certain 'price' does not prohibit distribution conditions, much less require the offeror to accede to any distribution terms demanded by the offeree."); *see also Sanofi*, 58 F.4th at 703.

39.    Indeed, "Congress's use of the singular 'covered entity' in the [statute] suggests that it had in mind one-to-one transactions between a covered entity and a drug maker without mixing in a plethora of pharmacies."  *Sanofi*, 58 F.4th at 704; *see also Novartis*, 2024 WL 2279829, at \*1 (stating that "Congress *has limited* the section 340B program in three important ways," including by defining "'covered entity' to mean only healthcare providers that fit within narrow categories" (emphasis added)).  And "[n]o other language in Section 340B requires delivery to an unlimited number of contract pharmacies."  *Sanofi*, 58 F.4th at 704.

40.    To the contrary, the 340B statute forbids covered entities from "resell[ing] or otherwise transfer[ring]" a covered outpatient drug "to a person who is not a patient of the entity." 42 U.S.C. § 256b(a)(5)(B).

41.    Congress has not expressly commanded pharmaceutical manufacturers to participate in 340B. *See Astra*, 563 U.S. at 117-18.  Instead, participation in 340B is generally understood as a condition for manufacturers' covered outpatient drugs to be eligible for reimbursement under either Medicare Part B or the federal share of Medicaid (in general, programs that provide elderly and financially needy patient populations access to health coverage).  42 U.S.C. § 1396r-8(a)(1), (5); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 579-80 (2012).

42.    Manufacturers "opt into" 340B by signing a form federal contract, known as a PPA, with HHS "for covered drugs purchased by 340B entities." *Astra*, 563 U.S. at 113, 117.  PPAs do not meaningfully vary between manufacturers but "simply incorporate statutory obligations and record the manufacturers' agreement to abide by them." *Id.* at 118.

43.    If HHS determines that a manufacturer breached its 340B obligations, HHS can terminate the PPA and remove the manufacturer from the 340B program.  *See* 42 U.S.C. § 1396r-8(b)(4)(B)(v); 61 Fed. Reg. 65,406, 65,412-13 (Dec. 12, 1996).  The manufacturer, in turn, may be forced to withdraw from participating in Medicare Part B and Medicaid, and their drugs will no longer be eligible to receive reimbursements under those programs, which would have a profound impact on many vulnerable patient populations and our healthcare system.  *See* 42 U.S.C. § 1396r-8(a)(1), (a)(5), (b)(4)(B)(v).

44.    Given the stakes for Medicare Part B and Medicaid and their patient populations, Congress chose to assign oversight and enforcement responsibilities exclusively to HHS to ensure the delicate balance that maintains manufacturer participation.  HHS, in turn, has delegated 340B's

oversight and enforcement to its component agency, HRSA.  Neither the 340B statute nor any federal regulations promulgated under it authorize, envision, or create room for state regulation of the 340B program.  Indeed, the Supreme Court made that clear in *Astra*, holding that the administration and enforcement provisions established an exclusive system of federal management designed to be "harmoniously" administered on a "nationwide basis," with HHS "hold[ing] the control rein." *Astra*, 563 U.S. at 120.

45.    Congress has also carefully specified the exclusive mechanisms available for administering 340B disputes and violations: audits, a process known as administrative dispute resolution ("ADR"), and an enforcement scheme directed by HHS.  For instance, the statute specifies that manufacturers have a right to audit covered entities to ensure that the covered entity is complying with the 340B program's requirements. 42 U.S.C. § 256b(a)(5)(C).  Manufacturers, in turn, are also subject to compliance audits.  *Id.* § 256b(d)(1)(B)(v).

46.    The imposition of penalties for violating 340B is directly committed to HHS: HRSA evaluates manufacturers' compliance with the 340B statute's requirements and may seek to have HHS impose civil monetary penalties on manufacturers that purposefully charge covered entities more than the statutory 340B ceiling price for covered outpatient drugs.  Specifically, HRSA may seek to have HHS impose civil monetary penalties of nearly $6,813 "for each instance of overcharging" a covered entity.  Annual Civil Monetary Penalties Inflation Adjustment, 88 Fed. Reg. 69,531, 69,535 (Oct. 06, 2023) (final rule); *see also* 42 U.S.C. § 256b(d)(1)(B)(vi); 42 C.F.R. § 10.11(a).  "Overcharging" refers to charging a covered entity a price above the applicable 340B "ceiling price."  Congress has specified that these civil monetary penalties can attach to manufacturers only where they "knowingly and intentionally" overcharge.  42 U.S.C. § 256b(d)(1)(B)(vi)(III).

47.    340B also provides for resolving 340B disputes between manufacturers and covered entities via an ADR process to be established through "[r]egulations promulgated by the Secretary [of HHS]." Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 7102(a), 124 Stat. 119, 826-27 (2010) (codified at 42 U.S.C. § 256b(d)(3)). These regulations must "designate or establish a decision-making official or decision-making body within [HHS] to be responsible for reviewing and finally resolving claims by covered entities that they have been charged prices for covered outpatient drugs in excess of the ceiling price . . . and claims by manufacturers that violations of [statutory prohibitions on unlawful transfers of 340B drugs and duplicate discounts] have occurred." Id. (codified at 42 U.S.C. § 256b(d)(3)(B)(i)); see 42 C.F.R. § 10.20. According to those regulations, claims adjudicated through ADR can include, among others, "[c]laims by a covered entity that it has been overcharged by a manufacturer for a covered outpatient drug." 42 C.F.R. § 10.21(c)(1); see also 89 Fed. Reg. 28,643, 28,657 (Apr. 19, 2024). Covered entities have previously taken the position that the ADR process applies to claims that a manufacturer has limited the covered entity's ability to purchase 340B-priced drugs, including through manufacturer "contract pharmacy" policies. Infra at ¶ 71.

48.    HRSA regulations also must be designed with such safeguards and "procedures as may be necessary to ensure that claims shall be resolved fairly, efficiently, and expeditiously." 42 U.S.C. § 256b(d)(3)(B)(ii). To ensure finality, the statute provides that "administrative resolution of a claim or claims . . . shall be a final agency decision and shall be binding upon the parties involved, unless invalidated by an order of a court of competent jurisdiction." Id. § 256b(d)(3)(C).

49.    Covered entities must also comply with additional requirements under 340B. As explained above, covered entities are prohibited from "resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity." Id. § 256b(a)(5)(B) (prohibiting unlawful

transfers).   Covered entities are also prohibited from seeking or causing unlawful "duplicate discounts or rebates" from manufacturers.  *Id.* § 256b(a)(5)(A).  Such "duplicate discounting" most often occurs when a covered entity obtains a drug at the 340B price and dispenses it to a Medicaid patient, and the manufacturer then also pays a Medicaid rebate to the state Medicaid agency on the same drug.  A covered entity that engages in unlawful transfers or duplicate discounting, no longer qualifies as a covered entity under the federal statute.  *Id.* § 256b(a)(4).  Whether a healthcare entity qualifies as a "covered entity" is a decision entrusted to the federal government.

### B.    Contract Pharmacy Abuses

50.    As noted above, 340B requires that a manufacturer offer 340B pricing only to a "covered entity."  42 U.S.C. § 256b(a)(1).  Retail pharmacies are not "covered entit[ies]," so they are ineligible to receive 340B pricing.  But certain private, for-profit entities—including the largest national chain pharmacies—have, in increasing numbers, sought to leverage 340B as a tool to enhance their profitability in a way that Congress never intended.  This is typically accomplished through complicated contractual arrangements between a covered entity, a pharmacy, and other entities like a third-party administrator.

51.    The core feature of these arbitrage arrangements is that the for-profit pharmacies end up obtaining drugs purchased at the 340B price.  These contract pharmacies, however, serve not only patients of 340B covered entities, but the general public as well—despite the fact that 340B-priced drugs are legally permitted to be dispensed only to patients of 340B covered entities.  Inevitably, and at great financial benefit to themselves, contract pharmacies sell drugs purchased at 340B prices to patients who are ineligible to receive such 340B-priced drugs.  *See infra* at ¶¶ 55-59, 61.

52.    Between 2010 and 2018, the number of such contract pharmacy arrangements with covered entities exploded, increasing "more than fifteen-fold, from about 1,300 to approximately

20,000 [as of 2018]."  U.S. Gov't Accountability Off., GAO-18-480, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* 10 (2018) ("2018 GAO Report"), https://www.gao.gov/assets/gao-18-480.pdf.  A more recent study put the increase at 4,228%, with now "more than 27,000 individual pharmacies (almost one out of every three pharmacies)" participating in 340B as contract pharmacies.  Aaron Vandervelde et al., *For-Profit Pharmacy Participation in the 340B Program*, at 4, Berkeley Rsch. Grp. (Oct. 2020), https://tinyurl.com/3rk5v8nu.  By 2020, each covered entity used an average of 22 contract pharmacies.  *Id.* at 7.  As a result, the number of actual claims for 340B discounts nationwide *tripled* between 2014 and 2019.  *See* Adam J. Fein, *New HRSA Data: 340B Program Reached $29.9 billion in 2019; Now Over 8% of Drug Sales*, Drug Channels (June 9, 2020), https://tinyurl.com/5n7bmw5m.  In 2022, 340B purchases reached $53.7 billion, a $9.8 billion increase from 2021 and a nearly $50 billion increase from 2009.  Fein 2023.

53.  Several federal watchdogs, including the U.S. Government Accountability Office ("GAO") and HHS's own Office of the Inspector General ("OIG"), have warned that the growth of these arrangements exacerbates concerns about abuse and unlawful claims for 340B drugs.  *See* 2018 GAO Report at 44 ("The identified noncompliance at contract pharmacies raises questions about the effectiveness of covered entities' current oversight practices."); *id.* at 45 ("The expansion of contract pharmacies . . . increases potential risks to the 340B Program, such as risks related to diversion and duplicate discounts.").

54.  Here is how the system has evolved over recent years:  Under the "replenishment model" now in widespread use by contract pharmacies, the pharmacies sell drugs from their general inventories to all individuals (both 340B covered entity patients and non-340B covered entity patients)—at prices significantly above the 340B price.  *See Examining Oversight Reports*

*on the 340B Drug Pricing Program: Hearing Before the S. Comm. On Health, Educ. Labor, & Pensions*, 115th Cong. 11 (2018) (statement of Ann Maxwell, Assistance Inspector Gen. for Evaluation & Inspections, OIG) ("Maxwell Testimony"), https://www.govinfo.gov/content/pkg/CHRG-115shrg30195/pdf/CHRG-115shrg30195.pdf ("[M]any contract pharmacies dispense drugs to all of their customers—340B-eligible *or otherwise*—from their *regular* inventory." (emphasis added)).  Pharmacies sell those drugs at a price or a rate negotiated by the patient's insurer that is significantly higher than the 340B price. On information and belief, covered entities *do not* retain title to the drugs throughout the process.

55.     Then, after subsequent data analysis using undisclosed algorithms, the contract pharmacies purport to retroactively identify individuals with some relationship to a covered entity—purported covered entity "patients" who were not previously identified as covered entity "patients" at the time the drug was dispensed.  *Novartis*, 2024 WL 2279829, at *3 (noting that the third-party administrators who run these algorithms "often receive a larger fee for every prescription deemed eligible for the discount").[2]  These black-box algorithms likely result in contract pharmacies claiming prescriptions as 340B-eligible where the individual who was dispensed the drug is not a covered entity "patient."  *See* HHS Office of Inspector General ("OIG"), Mem. Report: Contract Pharmacy Arrangements in the 340B Program OEI 05-13-00431, at 16 (Feb. 4, 2014), https://bit.ly/3eWKmBQ.[3]  This process operates in an "after-the-fact" manner inconsistent with the specific program guidance published by HRSA.  Although that guidance

---

[2] *See, e.g.*, 2018 GAO Report at 2; Maxwell Test. at 11.

[3] HHS OIG has acknowledged this problem.  It discussed the following hypothetical:  a physician, who practices part-time at a covered entity hospital, gives a prescription to a patient at his private practice.  *See* Maxwell Test. at 11. Although this prescription would likely not qualify for 340B, *see* 80 Fed. Reg. 52,300, 52,306 (Aug. 28, 2015), one contract pharmacy said it would claim a 340B price because it simply matches the name of the prescriber with those who work at a 340B covered entity *at all* (even if only part time), *see* Maxwell Test. at 11.  This demonstrates how contract pharmacies can expand the definition of an eligible "patient" to cover additional, non-340B prescriptions. *See also Novartis*, 2024 WL 2279829, at *3 (remarking on this very issue).

provides that each prescription be verified as 340B-eligible at the time of drug dispensing, that does not occur under the replenishment model.  *See* 61 Fed. Reg. 43,549, 43,556 (Aug. 23, 1996); *see Novartis*, 2024 WL 2279829, at *3 ("Only after dispensing the drugs do these pharmacies attempt to discern whether individual customers were patients of covered entities—in other words, whether individual prescriptions were eligible for the discount.").

56.    Under the replenishment model, after using some undisclosed process to identify drugs that may have been sold to purported patients of a covered entity, the pharmacies then purchase additional drugs at the 340B price—nominally in the name of the covered entities—to "replenish" the drugs sold previously to the purported patients.

57.    Once those replenishment drugs are received, the cycle starts anew:  the 340B-priced drugs are again commingled in the pharmacy's general inventory and dispensed to any individual who walks in the door, regardless of covered entity patient status.  Decl. of Krista M. Pedley ¶ 11, *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Human Servs.*, No. 21-cv-00634-PGS-JBD (D.N.J. June 24, 2021), ECF No. 93-2 (HRSA Director of Office of Pharmacy Affairs stating that under the replenishment system, contract pharmacies use stock replenished at 340B prices as "neutral inventory" that "may be dispensed to any subsequent patient").

58.    As is evident, the replenishment model simply seeks to lower the price of drugs for pharmacies and covered entities, not patients—by seeking to replenish contract pharmacy inventories with 340B-priced drugs.  There is no dispute that the pharmacies could replenish their inventories by ordering the drugs at market prices, but they instead attempt to do so at 340B prices.  There is also no dispute that 340B discounts are not required to be passed along to patients.

59.    This "replenishment" practice can provide a windfall for covered entities and pharmacies.  *See* GAO, GAO-20-108, *340B Drug Discount Program: Increased Oversight Needed*

20

*to Ensure Nongovernmental Hospitals Meet Eligibility Requirements* 5 (2019), https://www.gao.gov/assets/gao-20-108.pdf (explaining that covered entities "purchase [340B-priced] drugs at the 340B Program price for all eligible patients regardless of the patients' income or insurance status" and "receiv[e] reimbursement from patients' insurance that may exceed the 340B prices paid for the drugs"). As the D.C. Circuit noted, "[t]he covered entity, the pharmacy, and the third-party administrator [who runs the algorithms referenced above] often divvy up the spread between the discounted price and the higher reimbursement rate." *Novartis*, 2024 WL 2279829, at *3. Accordingly, "[e]ach of these actors . . . has a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Id.*

60.    By contrast, patients routinely do not receive the benefit of the discount in the form of lower prescription costs. *See* Rory Martin & Kepler Illich, *Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?*, at 3, 12, IQVIA (2022), https://tinyurl.com/mvuy8276 (concluding that "most 340B-eligible patients at contract pharmacies are not directly benefiting from 340B discounts" and that stakeholders in the 340B program, such as contract pharmacies, are "profit[ing] from 340B revenue"); Rory Martin & Harish Karne, *The 340B Drug Discount Program Grew to $124B in 2023*, at 6, IQVIA (2024), https://tinyurl.com/y9aeb727.

61.    Both CVS and Walgreens, two of the largest for-profit pharmacy retailers, have publicly disclosed, for example, that 340B profits are material to their finances. CVS Health Corp., Annual Report (SEC Form 10-K), at 22 (Feb. 8, 2023), https://bit.ly/3Sh3Dl1; Walgreens Boots Alliance, Inc., Annual Report (SEC Form 10-K), at 28 (Oct. 13, 2022), http://bit.ly/3kflVXh ("Changes in pharmaceutical manufacturers' pricing or distribution policies and practices as well as applicable government regulations, including, for example, in connection with the federal 340B

drug pricing program, could also significantly reduce our profitability."). And journalists have revealed how in many cases 340B price reductions are not passed on to vulnerable populations in the form of lower prices.[4]

62.    Besides diverting 340B price reductions, the explosion in contract pharmacy arrangements has also led to an increase in unlawful transfers of drugs purchased at a 340B price. *See, e.g.*, 42 U.S.C. § 256b(a)(5)(B) (prohibiting transfer or sale to anyone "who is not a patient of the [covered] entity"); GAO, GAO-11-836, *Drug Pricing, Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 28 (2011), https://www.gao.gov/assets/gao-11-836.pdf ("Operating the 340B program in contract pharmacies creates more opportunities for drug diversion compared to in-house pharmacies."). Indeed, approximately two-thirds of unlawful transfers uncovered by HRSA audits "involved drugs distributed at contract pharmacies." 2018 GAO Report at 44.

63.    The use of contract pharmacies can also exacerbate unlawful "duplicate discounting." 42 U.S.C. § 256b(a)(5)(A). Unlawful duplicate discounting forces the manufacturer to provide a discount on its drug twice-over—once under 340B to the covered entity, and again in the form of a rebate to the state Medicaid agency. GAO has found that duplicate discounting happens with outsized frequency when covered entities use contract pharmacies. *See, e.g.*, 2018 GAO Report at 45.[5] As the GAO explains, this is because of the difficulty of auditing and obtaining reliable data for covered entities with "complex" networks of contract pharmacies. *Id.*

---

[4] *See also* Anna Wilde Matthews et al., *Many Hospitals Get Big Drug Discounts. That Doesn't Mean Markdowns for Patients*, WALL ST. J. (Dec. 20, 2022), https://tinyurl.com/bdhhzdhr (explaining that many hospitals do not pass on 340B discounts to their patients and that 340B appears to bolster profits in well-off areas).

[5] *See generally* U.S. Gov't Accountability Off., GAO-20-212, *340B Drug Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement* (2020), https://www.gao.gov/assets/gao-20-212.pdf.

C.     **Covered Entities' Repeated Efforts To Expand 340B**

64.     Covered entities have repeatedly attempted to circumvent federal authority over 340B to impose their own preferred obligations on 340B manufacturers.  In 2006, covered entities filed suit against several pharmaceutical manufacturers, claiming they had been overcharged for 340B drugs in violation of the PPAs between manufacturers and the federal government.  *Astra*, 563 U.S. at 116-17.  In 2009, the Supreme Court unanimously rejected such private actions as an alternative 340B enforcement mechanism, emphasizing the need for 340B to be uniformly administered with an eye toward implications for other federal healthcare programs.  *Id.* at 120.  As the Supreme Court held, "Congress vested authority to oversee compliance with the 340B Program in HHS and assigned no auxiliary enforcement role to covered entities."  *Id.* at 117.  Rather than allowing "340B entities to launch lawsuits in district courts across the country," with the attendant "risk of conflicting adjudications," "Congress directed HRSA to create a formal dispute resolution procedure, institute refund and civil penalty systems, and perform audits of manufacturers."  *Id.* at 120-21.  "Congress thus opted to strengthen and formalize HRSA's enforcement authority, to make the new adjudicative framework *the proper remedy*."  *Id.* at 121-22 (emphasis added).

65.     Approximately ten years later, with the continued explosion in contract pharmacy arrangements, the increased use of the replenishment model, and documented problems with program integrity, certain PhRMA members independently adopted new policies to address the 340B abuses reported by federal watchdogs.  *See, e.g.*, First Am. Compl. at ¶¶ 48-52, *AstraZeneca Pharms. LP v. Becerra*, No. 1:21-cv-00027-LPS (D. Del. Feb. 12, 2021), ECF No. 13.

66.     In response, the General Counsel of HHS issued a legal opinion on December 30, 2020, purporting to interpret the 340B statute and declaring that "*to the extent* contract pharmacies are acting as *agents* of a covered entity, a drug manufacturer in the 340B Program is obligated to

deliver its covered outpatient drugs to those contract pharmacies and to charge the covered entity no more than the 340B ceiling price for those drugs." HHS, Off. Of the Sec'y, Advisory Opinion 20-06 on Contract Pharmacies Under the 340B Program, at 1 (Dec. 30, 2020) ("Advisory Opinion"), https://tinyurl.com/2s4f924r (emphasis added); *AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 55-56 (D. Del. 2021). Although the Advisory Opinion was subsequently vacated on other grounds, it confirms that even HHS concluded that, at a minimum, an agency relationship is required between a covered entity and its contract pharmacy, echoing prior HRSA guidance. 61 Fed. Reg. at 43,550, 43,555.

67. In May 2021, HRSA issued letter decisions to the manufacturers that were implementing policies to address 340B abuses.[6] Litigation ensued. In the context of those suits,[7] courts have repeatedly concluded that the scope of manufacturers' obligations does not encompass providing 340B-priced drugs to an unlimited number of contract pharmacies—the exact same requirement Maryland seeks to impose here. Most recently, the D.C. Circuit rejected the assertion that 340B requires manufacturers to provide 340B-priced drugs to an unlimited number of contract pharmacies. *Novartis*, 2024 WL 2279829, at *5. As the D.C. Circuit concluded, Congress chose to impose only certain restrictions on 340B-participating manufacturers—that they make a "bona

---

[6] *See* HRSA, 340B Drug Pricing Program, *HRSA Determines Six Pharmaceutical Manufacturers Are in Violation of the 340B Statute*, Health Res. & Servs. Admin., HRSA Letter to AstraZeneca Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/2nybf4z2; HRSA Letter to Lilly USA, LLC Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/5xkem3y7; HRSA Letter to Novartis Pharmaceuticals Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/jytw6xd6; HRSA Letter to Novo Nordisk Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/ycxwceaz; HRSA Letter to Sanofi Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/2veh5838; HRSA Letter to United Therapeutics Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/2p85wz8d.

[7] *Eli Lilly & Co. v. Becerra*, No. 1:21-cv-81 (S.D. Ind.); *AstraZeneca Pharms. LP v. Becerra*, No. 1:21-cv-00027-LPS (D. Del.); *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Human Servs.*, No. 3:21-cv-00634-FLW-LHG (D.N.J.); *Novo Nordisk Inc. v. U.S. Dep't of Health & Human Servs.*, No. 3:21-cv-00806-FLW-LHG (D.N.J.); *Novartis Pharms. Corp. v. Becerra*, No. 1:21-cv-01479 (D.D.C.); *United Therapeutics Corp. v. Espinosa*, No. 1:21-cv-1686-DLF (D.D.C.); *cf. Pharm. Rsch. & Mfrs. of Am. v. Becerra*, No. 21-cv-00198-PWG (D. Md.).

fide" offer, i.e., that they "propose to sell covered drugs to covered entities at or below a specified monetary amount." *Id.* at *5. This means that manufacturers remain free to impose "conditions on the distribution of covered drugs to covered entities." *Id.* at *8.

68.    And the D.C. Circuit similarly rejected the notion that purported silence allowed for imposition of an unlimited contract pharmacy requirement. As that court noted, purported "silen[ce] about delivery conditions . . . preserves—rather than abrogates—the ability of sellers to impose at least some delivery conditions." *Novartis*, 2024 WL 2279829, at *5. The court also noted that this silence did not mean that manufacturers have carte blanche as to conditions. *Id.* at *8. Instead, Congress carefully circumscribed the obligations it placed on manufacturers, only permitting conditions that would not move offers out of the realm of "bona fide" offers. *Id.* at *8.

69.    The Third Circuit's decision in *Sanofi* likewise rejected the very same obligation Maryland seeks to impose here. 58 F.4th at 703-04. The Third Circuit noted that "Congress's use of the singular 'covered entity' in the [statute's] 'purchased by' language suggests that it had in mind one-to-one transactions between a covered entity and a drug maker *without mixing in a plethora of pharmacies*." *Id.* (emphasis added); *id.* at 704 (340B does not "require[] delivery to an unlimited number of contract pharmacies"). The Third Circuit also expressly enjoined the federal government from imposing this requirement. *Id.* at 706 (barring the federal government "from enforcing against [plaintiffs] its reading of Section 340B as requiring delivery of discounted drugs to an unlimited number of contract pharmacies"); *id.* at 704 ("'Congress knew how to' grant covered entities permission to contract with third parties for distribution . . . but did not.").

70.    In doing so, the Third Circuit concluded that, despite the statute's "silence" as to contract pharmacies, such an unlimited contract pharmacy requirement "overstepped the statute's bounds." *Sanofi*, 58 F.4th at 707. The Third Circuit left open the possibility, however, that the

federal obligation may require that manufacturers offer to deliver 340B-priced drugs to some pharmacies in certain circumstances (for example, a single contract pharmacy where a covered entity lacks its own in-house pharmacy). *Sanofi*, 58 F.4th at 703-04. Thus, *Sanofi* recognizes there is no gap in 340B—instead the question requires interpretation of federal law. *Id.* at 705.[8]

71.    For their part, covered entities have sought to use the federal ADR mechanism, which is overseen by a panel within HHS, to enforce this purported obligation. In those proceedings, a group of covered entities alleged that a drug manufacturer "ha[d] violated the 340B statute and regulations by failing to offer covered outpatient drugs at the 340B ceiling price through Petitioner's contract pharmacy arrangements." They asked the panel "to order [the manufacturer] to resume offering covered outpatient drugs at the 340B ceiling price to Petitioner through its contract pharmacies; and to order [the manufacturer] to pay Petitioner an amount equal to the 340B discounts that [the manufacturer] has failed to provide." Petition for Damages and Equitable Relief ¶ 1, *Open Door Cmty. Health Ctrs. v. AstraZeneca Pharms., LP*, ADR ID: 210112-1 (HHS ADR Bd. Jan. 13, 2021), https://pink.citeline.com/-/media/supporting-documents/pink-sheet/2021/01/open-door-adr-petition.pdf?rev=99130335a69d448fafa0110cab3230f6&hash=676DEFD45F067461E1FB3E72CD3CA492; *see also* Petition for Monetary Damages and Equitable Relief ¶¶ 35-37, *Univ. of Wash. Med. Ctr. v. AstraZeneca Pharms. LP* (HHS Bd. Sept. 29, 2023) (asserting panel has jurisdiction over contract pharmacy disputes).

72.    Dissatisfied with the outcomes in federal court and before the federal agency, covered entities turned their sights to lobbying states, seeking to impose this obligation on manufacturers as a matter of state law. While covered entities previously considered contract

---

[8] One appeal remains pending. *See Eli Lilly & Co. v. Becerra*, Nos. 21-3128, 21-3405 (7th Cir.).

pharmacy use an issue of pricing, they now erroneously portray such laws as imposing a mere "delivery" obligation.

73.    The recently enacted Inflation Reduction Act ("IRA") also makes clear the interrelationship between 340B and Medicare.  The IRA establishes the Medicare Drug Price Negotiation Program, under which HHS is to "negotiate" with manufacturers "maximum fair prices" for certain drugs.  42 U.S.C. § 1320f-3(a).  Manufacturers must provide drugs under these so-called maximum fair prices, except that they need not provide access to the maximum fair prices when drugs are 340B eligible and the 340B price is lower than the maximum fair price.  *Id.* § 1320f-2(d).  That is, manufacturers need not provide duplicate 340B and "maximum fair price" discounts.  *Id.*  To avoid duplicate discounting, this scheme necessarily requires identifying when a drug subject to the maximum fair price is dispensed as a 340B drug.

**D.    Maryland Enacts HB 1056 To Impose State-Law Conditions On 340B**

74.    On May 16, 2024, Maryland enacted HB 1056.  HB 1056 expressly provides that its regulatory object is the federal 340B program.  *See* Md. Code, Health Occ. § 12-6C-09.1(A)(4)(I) ("'340B drug' means a drug that: [i]s a covered outpatient drug under 42 U.S.C. § 256b; [h]as been subject to an offer for reduced prices by a 340B manufacturer under 42 U.S.C. 256b(a)(1); and [i]s purchased by a covered entity.").  HB 1056 is to take effect on July 1, 2024. HB 1056, § 3.

75.    HB 1056 instructs that "a 340B manufacturer may not directly or indirectly deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with or otherwise authorized by a covered entity to receive such 340B drugs on behalf of the covered entity unless the receipt of 340B drugs is prohibited by the U.S. Department of Health and Human Services."  *Id.* § 12-6C-09.1(C)(1).

76.     HB 1056 defines "covered entity" to have "the meaning stated in 42 U.S.C. § 256b(a)(4)."    *Id.* § 12-6C-09.1(A)(2).    HB 1056 defines "340B manufacturer" as "a manufacturer, as defined in 42 U.S.C. § 1396r–8(k)(5), of covered outpatient drugs that has signed a pharmaceutical pricing agreement under 42 U.S.C. § 256b(a)(1)." *Id.* § 12-6C-09.1(A)(5).  The word "pharmacy" "means an establishment in which prescription or nonprescription drugs or devices are compounded, dispensed, or distributed." *Id.* § 12-101(t).  HB 1056 is not limited to Maryland "340B manufacturers," "covered entities," or "pharmacies."

77.     HB 1056's text nowhere requires that drugs purchased at the 340B price that are provided to a pharmacy be dispensed only to patients of a covered entity, as provided for by 340B. On the contrary, HB 1056 expressly requires that a manufacturer cannot restrict or prohibit contract pharmacies from purchasing or obtaining drugs at the 340B price in any circumstance.

78.     HB 1056 applies to both patented and generic drugs alike.  HB 1056 defines "340B drug" to mean (1) "a covered outpatient drug under 42 U.S.C. § 256b," that "[h]as been subject to an offer for reduced prices by a 340B manufacturer under 42 U.S.C. § 256b(a)(1)," and that "[i]s purchased by a covered entity."  42 U.S.C. § 256b defines "covered outpatient drug" in reference to the Social Security Act, which defines "covered outpatient drugs" to mean "drug[s] which may be dispensed only upon prescription."  42 U.S.C. § 1396r-8(k).

79.     HB 1056 does not acknowledge HRSA's enforcement authority or the congressionally mandated safeguards for administrative dispute resolution under 340B.  It also does not consider the limitations on enforcement power Congress deemed necessary to maintain the 340B program's delicate balance.

80.     HB 1056 makes any violation of its provisions a violation of Maryland's Consumer Protection Act.  Md. Code, Health Occ. § 12-6C-09.1(D)(1).  That Act gives enforcement authority

to the Maryland Attorney General over violations of that provision.  Md. Code, Com. Law § 13-401 *et seq.*  HB 1056 further gives investigative and enforcement power to the Attorney General and Board of Pharmacy.  Md. Code, Health Occ. § 12-6C-09.1(D)(1).

81.    The remedies and penalties provided for in Maryland's Consumer Protection Act include criminal penalties, a civil penalty of $5,000 per each violation, cease-and-desist orders, restitution, and revocation of relevant licenses*. Id.* § 12-6C-09.1(D)(1)-(3); Md. Code, Com. Law § 13-403; *id.* § 13-409; *id.* § 13-410; *id.* § 13-411.   These procedures and remedies differ dramatically from, and extend far beyond, 340B procedures and remedies.  *See, e.g.*, 42 U.S.C. § 256b(d).  This includes Maryland's provision of criminal penalties.  Md. Code, Health Occ. § 12-6C-09.1 (D)(1)(I), Md. Code Ann., Com. Law § 13-411(a).

82.    HB 1056 expressly rests its purported addition of a state law obligation on the existence of a preexisting federal obligation.  Md. Code, Health Occ. § 12-6C-09.1(D)(1).  As a result, in any state enforcement proceeding, a state adjudicator will be required to answer multiple questions of federal law to determine if a manufacturer violated HB 1056.  These include, among other things, whether under *federal* law:  (1) a particular covered entity has permissibly contracted with a contract pharmacy under federal law and has the necessary "principal-agent" relationship required to even arguably comply with federal law, 42 U.S.C. § 256b(a)(5)(A)-(B); (2) the covered entity continues to "hold title" to the 340B-priced drugs throughout all relevant transactions (which does not occur under the prevailing "replenishment model"); (3) all of the individuals receiving 340B-priced drugs meet the federal definition of a 340B patient; (4) the particular prescriptions at issue qualify for 340B prices; and (5) the 340B price reductions are duplicative of Medicaid rebates applicable to the same prescriptions, *id.* § 256b(a)(5)(A).  For example, a covered entity that sells or transfers 340B-priced drugs to anyone other than its patients is no longer eligible to receive

340B-priced drugs.  *Id.* § 256b(a)(5).  Similarly, covered entities violating prohibitions on duplicate discounts are ineligible to receive any 340B-priced drugs.  *Id.* § 256b(a)(4)-(5).  Under HB 1056, a Maryland state adjudicator court will be required to make these determinations to adjudicate any purported violation of HB 1056.

## CLAIMS FOR RELIEF

### CLAIM I
### (Declaratory/Injunctive Relief—Preemption)

83.    PhRMA re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

84.    Federal law is "the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

85.    HB 1056's forced sale and state-law enforcement provisions are preempted because they intrude upon the exclusive field created by 340B and, worse, do so in a way that directly conflicts with the federal statute's terms and in a manner that is likely to generate conflict between state and federal regulators.

86.    Field preemption exists where (1) Congress's "framework of regulation [is] 'so pervasive'" that Congress has "left no room for the States to supplement it," or (2) where there is a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."  *Arizona v. United States*, 567 U.S. 387 399 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  Field preemption is especially likely where a state law "'diminish[es] the [Federal Government]'s control over enforcement' and 'detract[s] from the integrated scheme of regulation' created by Congress."  *Id.* at 402 (quoting *Wisc. Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 288-89 (1986)).

87.    As the Supreme Court has recognized, Congress created a comprehensive federal program in 340B and centralized control of that program exclusively within HHS to safeguard the delicate balance Congress struck.  *See Astra*, 563 U.S. at 120 (noting the "interdependent" nature of 340B with other federal programs).  No room exists for state supplantation in this field.  Unlike some other federal healthcare programs, where Congress assigned the states significant roles, it did not here.  *See* 42 U.S.C. § 1396a (Medicaid statute); 42 U.S.C. § 18031 (Affordable Care Act).

88.    The system crafted by Congress did not impose open-ended obligations on manufacturers.  Instead, Congress designed a pervasive and integrated scheme of regulation through the creation of a closed and limited system.  Congress carefully defined those eligible to receive 340B drugs (enumerated covered entities), set the nature of the benefit (a set ceiling price calculation), and imposed limitations on that benefit (to whom covered entities may furnish 340B-priced drugs).  Congress spoke in exacting detail because 340B, given its interconnection with other federal programs, must maintain a delicate balance.  Finally, Congress set out an exclusive federal enforcement scheme to maintain the program as a harmonious whole.

89.    HB 1056 nevertheless seeks to directly intrude on this carefully balanced federal program by expanding the scope of manufacturers' obligations to include providing 340B-priced drugs to an unlimited number of contract pharmacies, and by implementing its own competing enforcement regime.  *See* Md. Code, Health Occ. § 12-6C-09.1(A)(4) (defining 340B drug as "a drug that: [i]s a covered outpatient drug under 42 U.S.C. § 256b; [h]as been subject to an offer for reduced prices by a 340B manufacturer under 42 U.S.C. 256b(a)(1); and [i]s purchased by a covered entity.").  That is far more than 340B requires, permits, or contemplates.  *Sanofi*, 58 F.4th at 703, 706 (enjoining federal government from mandating what Maryland now attempts to do).

90.     That intrusion into the field of the operation of 340B is made clear by HB 1056's scope.  Maryland pharmacies can freely order any drug legally available to them at market pricing.  HB 1056 does not seek to expand access to drugs generally—it merely seeks to compel 340B pricing for drug orders.  340B's reticulated scheme regarding who can receive 340B-priced drugs thus directly occupies the arena into which Maryland has stepped.

91.     HB 1056 is also conflict preempted.  Conflict preemption arises when "it is impossible to comply with both state and federal law" or when "'the state law stands as an obstacle to the accomplishment of the full purposes and objectives' of federal law."  *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191-192 (4th Cir. 2007) (quoting *Worm v. Am. Cyanamid Co.*, 970 F.2d 1301, 1305 (4th Cir. 1992)).  A conflict exists between the 340B statute and federal PPAs, and HB 1056 for several reasons.

92.     *First*, 340B requires only that manufacturers "offer" 340B-priced drugs to covered entities (*i.e.*, that they provide some meaningful path for covered entities to access these medications).  *See* 42 U.S.C. § 256b(a)(1); *Novartis*, 2024 WL 2279829, at *5-6; *Sanofi*, 58 F.4th at 703.  Congress placed strict limits on the types of entities entitled to 340B pricing (contract pharmacies are not included) and the scope of the required offer by manufacturers.  Congress also expressly prohibited any covered entity from reselling or otherwise transferring a 340B-priced drug to anyone other than its patients.  42 U.S.C. § 256b(a)(5)(B).  Several PhRMA members have already noted in pending litigation that because a retail pharmacy is not a "patient of [a covered] entity," it is prohibited by federal statute from receiving 340B-priced drugs.[9]

---

[9] *See, e.g.*, Pls.' Combined Mem. In Supp. Of Pls.' Cross-Mot. For Summ. J. &at 29, *Eli Lilly & Co. v. Azar*, No. 1:21-cv-00081-SEB-MJD (S.D. Ind. May 10, 2021), ECF No. 89.

93.     By mandating that manufacturers provide those 340B-priced drugs to any and all contract pharmacies that a covered entity chooses to contract with, HB 1056 dramatically expands manufacturers' obligations.  And it seemingly requires manufacturers to do so even where covered entities do not, as required by federal law, retain title to the drugs or have the requisite principal-agent relationship with contract pharmacies.  Indeed, Maryland now seeks to impose as a matter of state law what even the federal government has been enjoined from requiring.  *Sanofi*, 58 F.4th at 706; *cf. Novartis*, 2024 WL 2279829, at *8.  As courts have recognized, this expansion of obligations under a federal incentive program are preempted.  *Forest Park II v. Hadley*, 336 F.3d 724, 732-33 (8th Cir. 2003) (holding states may not impose additional obligations on participants in incentive-based, federal programs, even where the federal statute does not explicitly bar such additional obligations).  HB 1056 conflicts with both 340B's plain text, and Congress's desire to create a carefully circumscribed and federally managed closed system.

94.     Nor can HB 1056 be saved by recasting it as a distribution requirement.  Maryland is attempting to regulate who can receive 340B-priced drugs, not drugs in general.  No one suggests that manufacturers will not provide market-priced drugs to pharmacies.  The aim instead is to force manufacturers to provide those same drugs to those same pharmacies at a lower price.  Indeed, absent the pricing requirement, Maryland's law would be meaningless.  Md. Code, Health Occ. § 12-6C-09.1(A)(4)(II) (defining "340B drug" in reference to the federal statutory price).

95.     *Second*, HB 1056's also includes limitations on data access that will prevent manufacturers from utilizing the federally provided dispute resolution process and from determining if duplicate discounting is occurring.  To use the federal administrative dispute resolution mechanism, manufacturers must first audit a covered entity.  *See* 42 U.S.C. § 256b(a)(5)(C), (d)(3)(B)(iv).  However, manufacturers are only permitted to conduct an audit

where they "have documentation which indicates there is reasonable cause." 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996). "Reasonable cause" is defined to mean "that a reasonable person could believe that a covered entity may have violated" the prohibition on transfer or sale, or the prohibition on duplicate discounting. *Id.* Accordingly, to even access the audit process to engage in an ADR proceeding, manufacturers must be able to access information that will allow them to determine if reasonable cause exists to suspect a covered entity is violating 340B's provisions. Indeed, courts have already recognized that "claims data conditions" may enable drug manufacturers "to better utilize the anti-fraud audit and ADR procedures," and found they were permitted under federal law. *Novartis*, 2021 WL 5161783, at *8. Maryland's broad prohibition prevents manufacturers from utilizing the federal resolution process that Congress provided.

96.    It also prevents them from discovering duplicate discounting. Under relevant federal draft guidance, a manufacturer must "indicate[] that the claim for [a] selected drug is a 340B-eligible claim and the 340B ceiling price is lower than the [maximum fair price] for the selected drug." CMS, Medicare Drug Price Negotiation Program, at 48.[10] To identify 340B-priced drugs, the draft guidance encourages dispensing entities to use claims codes indicating drugs dispensed under the 340B program. *Id*. at 41. But HB 1056's broad prohibition on manufacturers "directly or indirectly deny[ing], restrict[ing], prohibit[ing], discriminat[ing] against, or otherwise limit[ing] the acquisition of a 340B drug by, or delivery of a 340B drug to," a contract pharmacy prevents manufacturers from requesting claims or utilization data as a condition of providing the drugs. Md. Code, Health Occ. § 12-6C-09.1(C)(1). Such data are exactly what manufacturers will need to avoid duplicate discounts under the federal Medicare Drug Price Negotiation Program.

---

[10] Draft Guidance on the Medicare Drug Price Negotiation Program, https://www.cms.gov/files/document/medicare-drug-price-negotiation-draft-guidance-ipay-2027-and-manufacturer-effectuation-mfp-2026-2027.pdf.

97.    *Third*, HB 1056's state-law enforcement provision both conflicts with the carefully calibrated system created by Congress to ensure 340B compliance and raises the specter of inconsistent adjudications.  Md. Code, Health Occ. § 12-6C-09.1(D).  Among other reasons, HB 1056 conflicts because it skews the carefully balanced enforcement scheme enacted by Congress.  Congress specified that a manufacturer may be held liable only when it "knowingly and intentionally" overcharges a covered entity.  42 U.S.C. § 256b(d)(1)(B)(vi)(III).  HB 1056 contains no such limitation.  HB 1056 also subjects manufacturers to criminal liability, including a potential felony conviction, while the federal statute does not.  And HB 1056 raises the specter of inconsistent adjudications identified in *Astra* because Maryland cannot enforce it without adjudicating multiple questions of federal law.  *See* Md. Code, Health Occ. § 12-6C-09.1(A)(2); 42 U.S.C. § 256b(a)(4).

98.    *Fourth*, HB 1056 frustrates the "accomplishment and execution of the full purposes and objectives of Congress," *Anderson*, 508 F.3d at 192, in various other ways.  For example, by purporting to impose additional, onerous terms on 340B, HB 1056 increases the cost of participation in the federal Medicare Part B and Medicaid programs.  As another example, HB 1056's mandates will contribute to duplicate discounts and diversion of 340B drugs to ineligible recipients, both of which the federal scheme forbids.

99.    For all of these reasons, HB 1056's forced sale and state-law enforcement provisions are preempted.  *See Cox v. Shalala*, 112 F.3d 151, 154 (4th Cir. 1997); *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824 (4th Cir. 2010).

## CLAIM II
### (Declaratory/Injunctive Relief—Unconstitutional Extraterritorial Regulation)

100.    PhRMA re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

101.    Under our constitutional framework, states may not directly regulate conduct that takes place wholly in another state.  "[A]ll States enjoy equal sovereignty."  *Shelby Cnty. v. Holder*, 570 U.S. 529, 535 (2013).  "A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003).

102.    The understanding that states may not impose on other states' regulatory powers follows from several Constitutional provisions.  States are denied certain powers that a sovereign might ordinarily impose, U.S. Const. art. I, § 10; and required to honor certain rights of other states, U.S. Const. art. IV, §§ 1, 2, 3.  Similarly, the Due Process Clause limits a state's ability to regulate conduct occurring wholly outside its borders.  *See Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70 (1954) (recognizing "the due process principle that a state is without power to exercise 'extra territorial jurisdiction,' that is, to regulate and control activities wholly beyond its boundaries").  The Commerce Clause provides that "[t]he Congress shall have Power . . . To regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.  Under that clause, states are prohibited from directly "control[ling] commerce occurring wholly outside [its] boundaries."  *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989); *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality op.).  While the Court recently refined the reach of the dormant Commerce Clause, it did not disturb its prior precedent establishing that state laws are unconstitutional where they "directly regulate[] out-of-state transactions by those with no connection to the State."  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374, 376 n.1 (2023).

103.    HB 1056 is unconstitutional under these principles.  HB 1056 broadly bans all pharmaceutical manufacturers—many of whom have no physical presence in Maryland—from

"directly or indirectly deny[ing], restrict[ing], prohibit[ing], discriminat[ing] against, or otherwise limt[ing] the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with or otherwise authorized by a covered entity to receive 340B drugs on behalf of the covered entity[.]"  Md. Code, Health Occ. § 12-6C-09.1(C)(1).  The statute does not limit its coverage to covered entities or pharmacies in Maryland, patients in Maryland, or even drugs that happen to pass through Maryland on the way to their ultimate destination.

104.    Much of the conduct regulated by HB 1056's forced sales provision will occur wholly beyond Maryland's borders.  For example, HB 1056 will apply to out-of-state transactions between out-of-state manufacturers and out-of-state distributors.  It will also apply to out-of-state transactions between out-of-state manufacturers or out-of-state distributors, on one side, and out-of-state covered entities.  The are no qualifiers limiting HB 1056's reach.  In sum, HB 1056 will operate even where the transactions occur out-of-state and involve only out-of-state actors.

105.    Finally, the extraterritorial reach of the HB 1056 is further heightened by the remedies available for violations of HB 1056.  The Maryland Attorney General is empowered under HB 1056 to issue cease-and-desist orders, among other things.  Md. Code, Health Occ. § 12-6C-09.1(D)(1); Md. Code Com. Law § 13-403.  Of course, given that much of the conduct regulated will occur out of state, HB 1056 gives its Attorney General authority to regulate conduct far outside of its borders—conduct that is likely entirely lawful in the state in which it occurs.

106.    By directly regulating commerce that occurs entirely outside of its borders, HB 1056 violates the Constitution's bar on extraterritorial state regulation.  *See Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 666-71 (4th Cir. 2018) (striking down a Maryland drug-pricing law that "directly regulates the price of transactions that occur outside Maryland[,]" where

37

the law allowed "Maryland to enforce the Act against parties to a transaction that did not result in a single pill being shipped to Maryland").

**CLAIM III**
**(Declaratory/Injunctive Relief—Preemption Under the Federal Patent Laws)**

107.    PhRMA re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

108.    Under the U.S. Constitution, the laws of the United States are "the supreme Law of the Land." U.S. Const., art. VI, cl. 2. The Constitution vests Congress with the authority to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." *Id.* at art. I, § 8, cl. 8. Pursuant to that power, Congress enacted the first federal Patent Act in 1790. *See* 1 Stat. 109 (1790). The Patent Act conveys Congress's "purpose . . . to have national uniformity in patent . . . laws." *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231 n.7 (1964).

109.    Congress has exercised its authority to spur innovation through the issuance of patents by enacting legislation specific to the pharmaceutical industry. *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified at 21 U.S.C. §§ 355, 360(cc), 35 U.S.C. §§ 156, 271(e) and 282). The Hatch-Waxman Act, for instance, "precisely . . . balance[s]" competing objectives, like the tension between "promoting innovation by increasing the profit reward of patents and the public interest in affordable drugs." *Biotechnology Indus. Org. v. District of Columbia*, 505 F.3d 1343, 1347 (Fed. Cir. 2007) (Gajarsa, J., concurring in the denial of the petition for rehearing en banc); *see also Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1371 (Fed. Cir. 2002).

110.    Although the Patent Act does not contain an express preemption provision, "state regulation of intellectual property must yield to the extent that it clashes with the balance struck

38

by Congress in our patent laws." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989); *see also Biotechnology Indus. Org. v. District of Columbia*, 496 F.3d 1362, 1372 (Fed. Cir. 2007) (state laws affecting patents cannot "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); *Sears, Roebuck & Co.*, 376 U.S. at 229. The Patent Act balances "two objectives": First, "to reward innovators with higher profits," and second, "to keep prices reasonable for consumers." *Biotechnology Indus.*, 496 F.3d at 1373. Congress is vested with authority to balance those competing aims. *Bonito Boats*, 489 U.S. at 151.

111. By prohibiting drug manufacturers from attaching basic conditions, HB 1056 alters the Patent Act's carefully calibrated economic balance. Manufacturers seeking to maximize profits must be able to decide what quantity, and under what conditions, they will distribute and/or sell their products. *See United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) (acknowledging the "long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to the parties with whom he will deal").

112. Price controls imposed by state law on patented drugs violate the Patent Act. *Biotechnology Indus.*, 496 F.3d at 1374. The "full exercise of the exclusionary power that derives from a patent" includes the authority to set basic conditions—like price—on the sale of a patented good. *Id.* States may not "re-balance the statutory framework of rewards and incentives insofar as it relates to inventive new drugs." *Id.* Although HB 1056 does not *directly* set the price of 340B drugs, it impairs the profit-maximizing right of patentees by prohibiting manufacturers from limiting the distribution and/or sale of 340B drugs to contract pharmacies. HB 1056 mandates that manufacturers must permit covered entities—like hospitals—to enter drug distribution agreements with an unlimited number of contract pharmacies. Therefore, HB 1056 results in the sale of additional 340B drugs that manufacturers would otherwise not undertake. In so doing, HB 1056

functionally sets the price on those "extra" drug sales by forcing PhRMA members to complete those sales at the 340B ceiling price.  Just as a direct price control violates the Patent Act, so too does a provision that effectively sets the price on extra sales a patentee would not otherwise undertake.  In short, HB 1056 compels PhRMA members to sell and/or distribute patented drugs to contract pharmacies, which violates the Patent Act by rendering unenforceable basic contractual provisions restricting the distribution of patented goods.

113.    Although states may apply generally applicable laws and regulations in furtherance of their authority to promote welfare and safety, states may not force patentees to distribute and/or sell a patented good pursuant to their general police power.  HB 1056 is not a generally applicable law with only an incidental effect on patented goods.  It is targeted specifically at drug manufacturers, with the effect of requiring manufacturers to provide for the wider distribution and/or sale of patented goods.  Accordingly, HB 1056 is preempted by the federal Patent Act.

## PRAYER FOR RELIEF

PhRMA respectfully prays that this Court:

a.    issue an order and judgment declaring that HB 1056 is unconstitutional and violates federal law;

b.    issue an order and judgment declaring that HB 1056 does not require PhRMA's members to offer 340B pricing on their covered outpatient drugs to contract pharmacies in Maryland or contract pharmacies located outside of Maryland that fall within the ambit of the statute;

c.    enjoin, preliminarily and permanently, the implementation and enforcement of HB 1056 against PhRMA's members;

d.    enjoin, preliminarily and permanently, the implementation and enforcement of HB 1056 as to the sale of PhRMA's members' drugs under 340B;

e.    award PhRMA costs and reasonable attorneys' fees, as appropriate; and

f.    grant any other relief the Court finds just and appropriate.

Dated:  June 5, 2024                     Respectfully submitted,

                                         */s/ Andrew D. Prins*
                                         Andrew D. Prins (Bar No. 10597)
                                         Philip J. Perry (*pro hac vice* forthcoming)
                                         Abid. R. Qureshi (*pro hac vice* forthcoming)
                                         Latham & Watkins LLP
                                         555 Eleventh Street, NW, Suite 1000
                                         Washington, DC 20004
                                         Tel: (202) 637-2200
                                         Fax: (202) 637-2201
                                         andrew.prins@lw.com
                                         philip.perry@lw.com
                                         abid.qureshi@lw.com

                                         *Counsel for Plaintiff Pharmaceutical Research and*
                                         *Manufacturers of America*